**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| **KIP YURT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CAUSE NO. 1:12-CV-00246** |
| | ) | |
| **CAROLYN W. COLVIN,**[1] | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Plaintiff Kip Yurt appeals to the district court from a final decision of the Commissioner

of Social Security ("Commissioner") denying his application under the Social Security Act (the

"Act") for a period of disability and Disability Insurance Benefits ("DIB").[2] (*See* Docket # 1.)

For the following reasons, the Commissioner's decision will be AFFIRMED.

## I.  PROCEDURAL HISTORY

Yurt applied for DIB in February 2011, alleging disability as of August 6, 2010. (Tr. 115-

16, 142.)  The Commissioner denied his application initially and upon reconsideration, and Yurt

requested an administrative hearing. (Tr. 55-73.)  On April 3, 2012, a hearing was conducted by

Administrative Law Judge ("ALJ") Yvonne Stam, at which Yurt (who was represented by

counsel), his wife, and a vocational expert ("VE") testified. (Tr. 29-50.)  On April 18, 2012, the

ALJ rendered an unfavorable decision to Yurt, concluding that he was not disabled because he

---

[1] Although Plaintiff brought this suit against Michael J. Astrue, the former Commissioner of Social
Security, Carolyn W. Colvin became the Acting Commissioner on February 14, 2013.  As such, under Federal Rule
of Civil Procedure 25(d), Colvin is automatically substituted as a party in place of Astrue. FED. R. CIV. P. 25(d).

[2] All parties have consented to the Magistrate Judge. (Docket # 13); *see* 28 U.S.C. § 636(c).

could perform his past relevant work, as well as a significant number of other jobs in the economy. (Tr. 9-21.)  The Appeals Council denied his request for review, at which point the ALJ's decision became the final decision of the Commissioner. (Tr. 1-3.)

Yurt filed a complaint with this Court on July 18, 2012, seeking relief from the Commissioner's final decision. (Docket # 1.)  In this appeal, Yurt alleges that the ALJ erred when assigning the residual functional capacity ("RFC") by failing to incorporate all of the limitations articulated by Dr. Lovko; ignoring the effects of work stress; "cherry-picking" the Global Assessment of Functioning ("GAF") scores of record; failing to properly weigh certain medical source opinions; failing to account for his difficulties in maintaining concentration, persistence, or pace; and ignoring the evidence about his headaches. (Pl.'s Br. 1, 11-25.)  Yurt also argues that the ALJ concluded in error that he had experienced no repeated decompensation episodes of extended duration and, in doing so, tainted his step two and step three findings. (Pl.'s Br. 1, 11-25.)

## II.  FACTUAL BACKGROUND[3]

### A.  Background

At the time of the ALJ's decision, Yurt was thirty-seven years old, had a high school education, and had past work experience as a cook and janitor. (Tr. 115-16, 144.)  He alleges that he is disabled due to a psychotic disorder. (Pl.'s Br. 2.)

At the hearing, Yurt testified that he lives with his wife, who is employed outside the home, and their two teenage children. (Tr. 32, 41-42.)  His daily activities center on performing household tasks such as laundry, dishes, meal preparation, and vacuuming; watching two hours

---

[3] In the interest of brevity, this Opinion recounts only the portions of the 496-page administrative record necessary to the decision.

of television; going to the library where he reads books and surfs the internet; and driving a car. (Tr. 35-36.)  He claimed he has to have everything "organized" and often repeats his cleaning rituals up to ten times per day. (Tr. 39.)

Yurt stated that he has not worked since his alleged onset date in August 2010 because of his "rage" and "[in]ability to . . . be around people." (Tr. 32, 34.)  He was attending counseling twice a month. (Tr. 34.)  His most recent episodes of rage occurred two months earlier (early 2012) when he bumped his neighbor's car without realizing it, and three months before that (late 2011) "[w]hen [he] was working for St. Francis." (Tr. 34.)  When the ALJ pointed out that Yurt had just testified that he had not worked anywhere since his alleged onset date in August 2010, Yurt cited his "memory problems." (Tr. 34.)

Yurt also testified that he can sit for only fifteen minutes before he has to get up and that his left hand shakes so much that he cannot hold a drink or a knife in it. (Tr. 37-38.)  He has no difficulty sleeping at night or staying awake during the day and does not experience side effects from his medications. (Tr. 38.)

Yurt's wife also testified at the hearing. (Tr. 40-44.)  She stated that she checks his medications because he forgets to take them on occasion. (Tr. 41.)  In the past few years, she has noticed that he is forgetful, often has to writes things down, and that his medications sometimes make him lethargic. (Tr. 41-42.)

## B.  Summary of the Relevant Medical Evidence

On May 24, 2010, Yurt was found wandering the hall at his place of employment with no recall of having left his work station. (Tr. 256.)  He was taken to the emergency room and later placed on medical leave through July 31, 2010. (Tr. 256.)

On July 1, 2010, Yurt saw Dr. Madhav Bhat, a neurologist, who concluded that Yurt was incorrectly diagnosed in childhood with a seizure disorder for which he had long been taking medications such as Dilantin, Gabitril, and Tegretol. (Tr. 259-60.)  A neurological examination and MRI and EEG monitoring over several days reflected no abnormalities. (Tr. 243, 247-50, 257-63.)  Dr. Bhat concluded that Yurt did not have a seizure disorder, but rather had "recurrent episodes of altered awareness of surroundings," symptoms of depression, and chronic daily bifrontal headaches. (Tr. 259-60.)  Dr. Bhat wrote that Yurt would remain off work until further order. (Tr. 260.)

Yurt returned to work in early August 2010, but was terminated several days later after an incident in which he reportedly held up a knife and threatened coworkers. (Tr. 277.)  On August 13, 2010, Yurt was examined by Dr. Frank Shao, a psychiatrist, who noted that Yurt had a bright affect, normal speech, and a goal-directed thought process. (Tr. 277-80.)  Although Yurt admitted to feeling irritable and somewhat depressed, there were no delusions or hopeless, helpless, or suicidal thinking. (Tr. 279.)  Yurt described some urge of and interest in violence, but was not obsessed by it. (Tr. 279.)  Dr. Shao stated that he could not pinpoint an exact diagnosis, but did identify a mood disorder, not otherwise specified, and a rule out bipolar disorder; he assigned Yurt a GAF score of 40 to 50.[4] (Tr. 279.)  He prescribed Lamictal for

---

[4] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. American Psychiatric Association, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., Text Rev. 2000). A GAF score of 21-30 reflects behavior that is considerably influenced by delusions or hallucinations, a serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation), or an inability to function in almost all areas (e.g., stays in bed all day; has no job, home, or friends). *Id.*  A GAF score of 31 to 40 reflects some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or a major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., avoids friends, neglects family, and is unable to work).  A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.*  A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or

Yurt's "mood lability" and in particular, his "explosive rages." (Tr. 279.)  He thought Yurt might

have a certain risk of violence towards himself and others, but did not see any acute risk. (Tr.

280.)  During August and September visits, Yurt reported feeling better on medication and

denied any side effects. (Tr. 274-76.)  The following month he reported hearing voices and

feeling violent urges, but denied any suicidal or homicidal thoughts. (Tr. 274-76.)

In October 2010, Yurt got a job working 20 to 25 hours a week as a cook at a university.

(Tr. 176.)  But on December 10, 2010, Yurt was voluntarily admitted to the hospital because he

was hearing voices telling him to kill people and had grabbed a co-worker by the throat. (Tr.

281-83.)  Upon mental examination, he appeared disheveled and exhibited poor eye contact, but

was oriented, had a fair memory, and a goal-directed thought process (Tr. 282); he was assigned

a GAF of 25 to 30 upon admission (Tr. 289).  Dr. Shao did not make any significant changes to

his medications. (Tr. 282.)  Soon after admission, however, his mood improved, there was no

evidence of psychosis, and he denied any auditory hallucinations, homicidal or suicidal

ideations, delusions, or depression. (Tr. 283.)  He was discharged within two days and assigned a

GAF of 35 to 40 and a diagnosis of provisional bipolar disorder with psychotic features. (Tr.

281.)

On January 19, 2011, Yurt saw Dr. Kenneth Ogu, complaining of racing thoughts, sleep

difficulties, a depressed mood, and hearing voices that tell him to hurt people. (Tr. 355-60.)  He

also reported having compulsive feelings about things needing to be done in a certain way. (Tr.

355.)  Dr. Ogu found that Yurt's attention and concentration were normal; assigned him a GAF

---

moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.*  And, a GAF score of 61 to 70  reflects some mild symptoms or some difficulty in social, occupational, or school functioning, but "generally functioning pretty well." *Id.*

of 60; and a diagnosis of psychosis not otherwise specified, rule out bipolar I disorder, and rule out intermittent explosive disorder. (Tr. 358.)

One week later, Yurt was voluntarily admitted to the hospital, reporting that he was hearing voices telling him to hurt or kill people, especially at work. (Tr. 311-13.) He also said that he had a disability hearing scheduled the following week. (Tr. 312.) Upon examination by Dr. Shao, Yurt appeared calm and had normal speech and a goal-directed thought process; he did not report feeling depressed. (Tr. 312.) There were no signs of internal preoccupation, and he denied any hopeless or helpless feelings; he did not identify any delusions. (Tr. 312.) He was assigned diagnoses of psychosis, not otherwise specified; rule out bipolar disorder with psychotic features; rule out malingering; and cannabis dependence in remission. (Tr. 312.) Dr. Shao did not make any significant medication changes. (Tr. 315.) Soon after admission, Yurt denied hearing any command auditory hallucinations, suicidal or homicidal ideations, or delusions. (Tr. 303.) He was discharged two days later, indicating that he felt much better. (Tr. 303.) Yurt then underwent counseling with Rachele DeFrancesco, a therapist at the Bowen Center; her notes reflect Yurt's complaints of depression, memory loss, "black outs," irritability, and auditory hallucinations. (Tr. 361-75.)

On February 23, 2011, Yurt returned to Ms. Francesco, who described his mood and affect as "angry, irritable, frustrated, depressed, and changeable" and his activity level as "relaxed, but somewhat agitated and lethargic." (Tr. 362-64.) He reported racing thoughts and confused thinking, but no current suicidal or homicidal ideation. (Tr. 362-63.) He was currently working part time and was not experiencing any employment-related issues. (Tr. 363.) Ms. Francesco did not consider Yurt "high risk" at the time. (Tr. 363-64.) He was diagnosed with a

6

psychotic disorder, not otherwise specified, and assigned a "fair" prognosis. (Tr. 364.)

Yurt quit his part-time job in March 2011 after he reportedly grabbed a co-worker by the throat. (Tr. 281.)  Ms. DeFrancesco wrote in March and April 2011that Yurt's "slow[ing] down" on his job and applying for disability was a "wise decision for now." (Tr. 374.)  She indicated that Yurt had several difficult weeks of hearing voices and experiencing night terrors; he told Ms. DeFrancesco that he decided not to attend his son's graduation due to these symptoms and because he had to watch his eight-week old niece. (Tr. 373.)

On April 13, 2011, Yurt was evaluated by Revathi Bingi, Ed.D., at the request of Social Security. (Tr. 349-53.)  She observed that he was poorly groomed and a poor historian; his mood appeared sad and depressed and his affect mostly flat. (Tr. 349.)  He had not experienced any homicidal ideation since his second hospitalization. (Tr. 349.)  Upon testing, Yurt's long term memory appeared poor and he had great difficulty doing simple math and serials of threes. (Tr. 351.)  On a typical day, he often isolates himself. (Tr. 351.)  Dr. Bingi thought that Yurt's hallucinations, paranoia, and anger restricted his life; that his quality of life appeared very poor; and that he ostensibly had great difficulty managing his symptoms. (Tr. 351.)  She assigned him a GAF of 45 and diagnosed a psychotic disorder, not otherwise specified; anxiety disorder, not otherwise specified; rule out paranoid schizophrenia; and rule out amnestic disorder, not otherwise specified. (Tr. 352.)

In May 2011, Ken Lovko, Ph.D., a state agency psychologist, reviewed Yurt's record and completed a mental RFC assessment, concluding that Yurt was moderately limited in the following abilities: understand, remember, and carry-out detailed instructions; perform activities within a schedule, maintain attendance, and be punctual; complete a normal workday and

workweek without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; get along with coworkers without distracting them or exhibiting behavioral extremes; and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (Tr. 377-78.)  He found that Yurt was "not significantly limited" in the remaining thirteen mental activity categories. (Tr. 377-78.)

> Dr. Lovko further opined as follows:
>
> While [Yurt's] symptoms may present some impediment to work situations with large numbers of people, it does seem that [he] could deal with environments that have fewer persons in them, and where stress levels are limited.
>
> The evidence suggests that claimant can understand, remember, and carry-out unskilled tasks without special considerations in many work environments.  The claimant can relate on at least a superficial basis on an ongoing basis with co-workers and supervisors.  The claimant can attend to task for sufficient periods of time to complete tasks.  The claimant can manage the stresses involved with unskilled work.

(Tr. 379.)  In addition, Dr. Lovko completed a psychiatric review technique in which he concluded that Yurt had no limitations in activities of daily living; no extended episodes of decompensation; and moderate limitations in maintaining social functioning and concentration, persistence, or pace. (Tr. 381-91.)  Dr. Lovko's opinion was later affirmed by Joelle Larson, Ph.D., a second state agency psychologist. (Tr. 452.)

Also in May 2011, Yurt underwent a physical disability examination at the request of Social Security, which reflected normal findings. (Tr. 405-10.)  Soon thereafter, a state agency physician reviewed Yurt's record and concluded that he did not have a severe physical impairment, a finding that was later affirmed by a second state agency physician. (Tr. 432, 451.)

Yurt continued to receive mental health counseling in June and July 2011. (Tr. 434-37.)

8

He was noted to have a flat affect. (Tr. 434-37.)  In July, he had a medication check with Dr. Ogu, who opined that Yurt's current medications were effective in reducing his psychotic symptoms; he continued the current treatment regimen.  (Tr. 438.)  Subsequent treatment notes reflect that psychotherapy sessions continued every two weeks and that Yurt's symptoms improved in the latter half of 2011. (Tr. 479, 484, 488-89, 495-96.)  For example, in November 2011, although Yurt reported becoming overwhelmed in a room full of people while on a college visit with his son, his symptoms were "generally normal except some occasional trouble sleeping," and he appeared calm and demonstrated an improved range in affect. (Tr. 479.)  A January 2012 note reflects that he continued to struggle in communicating with his wife and with his psychosis and anxiety. (Tr. 484.)

### III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted).  The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or

9

substitute its judgment for the Commissioner's. *Id.*  Rather, if the findings of the Commissioner

are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212

(7th Cir. 2003).  Nonetheless, "substantial evidence" review should not be a simple rubber-stamp

of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## IV.  ANALYSIS

### A.  The Law

Under the Act, a claimant is entitled to DIB if he establishes an "inability to engage in

any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to . . . last for a continuous period of not less than 12

months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A).  A physical or mental impairment is "an

impairment that results from anatomical, physiological, or psychological abnormalities which are

demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C.

§ 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process,

requiring consideration of the following issues, in sequence: (1) whether the claimant is currently

unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's

impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. §

404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5)

whether the claimant is incapable of performing work in the national economy.[5] *See Dixon v.*

*Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. § 404.1520.  An affirmative answer

---

[5] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a).  The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

### B. The ALJ's Decision

On April 18, 2012, the ALJ issued the decision that ultimately became the Commissioner's final decision. (Tr. 9-21.) She found at step one of the five-step analysis that although Yurt initially denied working after his alleged onset date, the record evidences that he worked part time for approximately six months after such date; the work, however, did not rise to the level of substantial gainful activity. (Tr. 11.) At step two, the ALJ concluded that Yurt's psychotic disorder was a severe impairment. (Tr. 11.) But the ALJ determined at step three that Yurt's impairment or combination of impairments were not severe enough to meet a listing. (Tr. 13.)

Before proceeding to step four, the ALJ determined that Yurt's symptom testimony was not reliable to the extent it was inconsistent with the following RFC (Tr. 16):

> [T]he claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: simple routine tasks not done around large numbers of people and with no more than brief and superficial interaction with others.

(Tr. 15).

Based on this RFC and the VE's testimony, the ALJ concluded at step four that Yurt was capable of performing his past relevant work as a dishwasher and kitchen helper. (Tr. 20.) In addition, the ALJ found at step five that Yurt could perform a significant number of other jobs in

11

the economy despite his impairments, including industrial janitor, cleaner, and towel folder. (Tr. 20-21.)  Accordingly, Yurt's claim for DIB was denied. (Tr. 21.)

    *C.  The RFC and the Hypothetical Posed to the VE Are Supported by Substantial Evidence*

       Yurt advances numerous arguments challenging the RFC assigned by the ALJ, which she then incorporated into a hypothetical posed to the VE at step five.  The Court will discuss each argument in turn; ultimately, however, none necessitate a remand of the Commissioner's final decision.

       1.  <u>The RFC and Hypothetical Adequately Accounted for the Limitations Articulated by Dr. Lovko</u>

       First, Yurt argues that the ALJ erred when she, after announcing that she "adopted" Dr. Lovko's opinion, failed to incorporate all of the limitations articulated by Dr. Lovko into the RFC.  As background, an RFC assessment "is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of all the evidence." SSR 96-5p; *see* 20 C.F.R. § 404.1545.

       Specifically, Yurt contends that the ALJ overlooked all of the mental activity categories on the mental RFC assessment in which Dr. Lovko found he was "moderately limited."  These areas include his ability to perform activities within a schedule, maintain regular attendance and punctuality, complete a normal workday and workweek without interruptions from psychologically-based symptoms, perform at a consistent pace without an unreasonable number

12

and length of rest periods, maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness. (Tr. 377-78.)

The ALJ, however, did not "cherry-pick" Dr. Lovko's mental RFC assessment as Yurt suggests. *See generally Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (explaining that an ALJ "may not selectively discuss portions of a physician's report that support a finding of non-disability while ignoring other portions of a physician's report that suggest a disability"). Rather, after checking the "moderately limited" box in seven areas and the "not significantly limited" box in the remaining thirteen areas, Dr. Lovko wrote in his narrative at the end of the assessment that Yurt's "functioning does not suggest [he] has lost capacity for unskilled work." (Tr. 379.)  He further opined that Yurt could "understand, remember, and carry-out unskilled tasks without special considerations in many work environments[,] . . . relate on at least a superficial basis on an ongoing basis with co-workers and supervisors[,] . . . attend to task for sufficient periods of time to complete tasks[,] . . . and manage the stresses involved with unskilled work." (Tr. 379.)

The instant circumstances therefore are analogous to the facts confronting the Seventh Circuit Court of Appeals in *Johansen v. Barnhart*, 314 F.3d 283, 288-89 (7th Cir. 2002).  There, the ALJ determined that the claimant was moderately limited in his ability to maintain a regular schedule and attendance and in his ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms. *Id.*  In posing a hypothetical to the VE, the ALJ relied upon the opinion of a consulting physician who stated that because the claimant was not significantly limited in seventeen of twenty work-related areas of mental functioning, he retained the mental RFC to perform "low-stress, repetitive work." *Id.*  The Court of Appeals

concluded that the ALJ's limitation to low-stress, repetitive work adequately incorporated Johansen's moderate mental limitations, articulating that the consulting physician had essentially "translated [his] findings into a specific RFC assessment, concluding that Johansen could still perform low-stress, repetitive work." *Id.*; *see also Milliken v. Astrue,* 397 F. App'x 218, 221-22 (7th Cir. 2010) (unpublished) (affirming ALJ's step five finding where a medical expert opined that despite claimant's difficulties in social functioning and concentration, persistence, or pace, she could still perform unskilled work).

Here, like the consulting physician in *Johansen*, Dr. Lovko "translated [his] findings into a specific RFC assessment." 314 F.3d at 288.  The ALJ then relied on Dr. Lovko's translation when she assigned Yurt an RFC limiting him to "simple, routine tasks not done around large numbers of people and with no more than brief and superficial interaction with others" (Tr. 15), and when posing a hypothetical to the VE for an individual who "can remember and carry out unskilled task[s] without special considerations, . . .  relate on at least a superficial basis with coworkers and supervisors, . . . attend to tasks for sufficient periods of time to complete them and, in addition, should not work around large numbers of people." (Tr. 45.)

To reiterate, an ALJ "is free to formulate h[er] mental residual functional capacity assessment in terms such as 'able to perform simple, routine, repetitive work' so long as the record adequately supports that conclusion." *Kusilek v. Barnhart*, No. 04-C-310-C, 2005 WL 567816, at *4 (W.D. Wis. Mar. 2, 2005); *see Johansen*, 314 F.3d at 289 ("All that is required is that the hypothetical question [to the VE] be supported by the medical evidence in the record." (quoting *Meredith v. Bowen*, 833 F.2d 650, 654 (7th Cir. 1987))).  Here, the record, in particular, Dr. Lovko's opinion, adequately supports the RFC assigned by the ALJ, and thus substantial

14

evidence supports the ALJ's step-five finding.

2.  The RFC and Hypothetical Adequately Account for the Effects of "Work Stress"

In tandem with his first argument, Yurt asserts that the RFC assigned by the ALJ and the hypothetical she posed to the VE at step five do not adequately account for "the individualized effects of work stress" on his mental functioning. (Pl.'s Br. 17.)  Indeed, as Yurt emphasizes, a claimant's "reaction to the demands of work (stress) is highly individualized," and "[a]ny impairment-related limitations created by an individual's response to demands of work . . . must be reflected in the RFC assessment." SSR 85-15, 1985 WL 56857, at *6.

But contrary to Yurt's assertion, the ALJ *did* adequately account for the effects of work stress in the RFC.  To reiterate, the ALJ explained that she relied upon the opinion of Dr. Lovko.  (Tr. 19.)  In his narrative, Dr. Lovko opined: "While [Yurt's] symptoms may present some impediment to work situations with large numbers of people, it does seem that [he] could deal with environments that have fewer persons in them, and where stress levels are limited." (Tr. 379.)  Dr. Lovko then specifically articulated that Yurt "can manage the stresses involved with unskilled work." (Tr. 379.)  Accordingly, as discussed earlier, the ALJ then assigned an RFC and posed a hypothetical to the VE that limited Yurt to unskilled tasks, relying upon Dr. Lovko's "translation" of clinical findings into an RFC assessment. *Johansen*, 314 F.3d at 288-89.  Therefore, the assigned RFC and the hypothetical posed to the VE are indeed supported by substantial evidence.

The ALJ also commented that although Yurt testified about ongoing, significant rage problems and an inability to be around crowds, he chose to go shopping on "Black Friday" (which the ALJ described as "one of the most pressure packed and socially aggravating

situations in which he could have voluntarily placed himself") in November 2011 and Yurt thought that he managed this stress "well." (Tr. 14.)  This comment is additional evidence of Yurt's ability to manage stress that the ALJ considered. *See generally Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995) (explaining that the ALJ must review the record fairly and must articulate, at least at some minimal level, her analysis of the evidence to allow this Court to trace the path of her reasoning and to be assured that she considered the important evidence). Therefore, Yurt's second argument also does not merit a remand of the assigned RFC.

   3.  The ALJ's Failure to Mention All of the GAF Scores of Record Is Not Reversible Error

   Next, Yurt alleges that the ALJ erred when determining the RFC by "cherry-picking" the GAF scores of record.  More particularly, Yurt argues that although the GAF scores of record range from 25 to 60, the ALJ's decision "mentions only one of them: Dr. Ogu's rating of 60 on January 19, 2011." (Pl.'s Br. 21.)

   But Yurt is wrong; the ALJ *also* mentioned another GAF score of record—the score of 45 assigned by Dr. Bingi in April 2011. (Tr. 18.)  Yurt, upon realizing his oversight, replies that the ALJ's decision is still flawed since she did not mention *all* of the GAF scores of record—in particular, the 25 to 30 assigned in December 2010 upon his admission to the hospital.  Yurt suggests that if the ALJ had, she would have concluded that Dr. Bingi's score of 45 was in line with the treating sources and that Dr. Ogu's score of 60 was actually on the high side.

   "But GAF scores are intended to be used to make treatment decisions, . . . not as a measure of the extent of an individual's disability." *Martinez v. Astrue*, No. 9 C 3051, 2010 WL 1292491, at *9 (N.D. Ill. Mar. 29, 2010) (internal quotation marks and citation omitted); *Curry v.*

*Astrue*, No. 3:09-cv-565, 2010 WL 4537868, at *7 (N.D. Ind. Nov. 2, 2010) ("GAF scores are more probative for assessing treatment options rather than determining functional capacity and a person's disability.").  This is because the score is a measure "of both severity of symptoms *and* functional level . . . [and] always reflects the worse of the two, the score does not reflect the clinician's opinion of functional capacity." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (emphasis in original) (quoting AM. PSYCHIATRIC ASS'N, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM-IV") 32-34 (4th ed. 2000)).  "Accordingly, nowhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on his GAF score." *Id.* (citation and internal quotation marks omitted); *accord Adams v. Astrue*, No. 1:06-cv-393, 2009 WL 1404675, at *4 (N.D. Ind. May 18, 2009).

Moreover, although the ALJ did not specifically mention each GAF score of record, it is clear that she considered the various medical source opinions articulating the GAF scores and thus "did not omit significant pieces of information necessary to understand the entire medical picture." *Mobley-Butcher v. Astrue*, No. 1:06-cv-934, 2007 WL 3124478, at *11 (S.D. Ind. Sept. 6, 2007); *see Zoephel v. Astrue,* No. 12-c-726, 2013 WL 412608, at *9-11 (E.D. Wis. Feb. 1, 2013) (collecting cases).  That is, she discussed the records from Dr. Shao, who assigned a GAF score of 40 to 50 in August 2010 (Tr. 16-17); Yurt's two brief inpatient stays in December 2010 and January 2011, in which he was assigned GAF scores ranging from 25 to 40 (Tr. 17); Dr. Ogu, who assigned the GAF of 60 in January 2011 (Tr. 17); and Dr. Bingi, who assigned the GAF score of 45 in April 2011 (Tr. 19).  Particularly relevant to the snapshot of lower GAF scores associated with Yurt's hospitalization, the ALJ observed that once admitted, Yurt no longer reported hallucinations or delusions, his mood was much better, and he was discharged

17

just two days later on each occasion. (Tr. 17.)

Given that the ALJ considered the underlying narrative records, the ALJ's failure to mention all of the GAF scores of record does not constitute reversible error. *See, e.g.*, *Moran v. Astrue,* No. 2:12-cv-28, 2013 WL 359657, at *11 (N.D. Ind. Jan. 30, 2013); *Bayless v. Astrue*, No. 11 C 3093, 2012 WL 3234044, at *16-17 (N.D. Ill. Aug. 6, 2012); *see generally Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result." (citations omitted)).

4. The ALJ Did Not Err When Weighing Dr. Ogu's and Dr. Shao's Opinions

Next, Yurt argues that the ALJ erred by failing to weigh, in accordance with 20 C.F.R. § 404.1527, an opinion from Dr. Ogu dated February 23, 2011, and two assessments made by Dr. Shao during Yurt's hospitalizations in December 2010 and January 2011.

To review, the Seventh Circuit has stated that "more weight is generally given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and circumstances." *Clifford*, 227 F.3d at 870; *see* 20 C.F.R. § 404.1527(c)(2). This principle, however, is not absolute, as "a treating physician's opinion regarding the nature and severity of a medical condition is [only] entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Clifford*, 227 F.3d at 870; *see also Johansen*, 314 F.3d at 287; 20 C.F.R. § 404.1527(c)(2). In the event the treating physician's opinion is not well supported or is inconsistent with other substantial evidence, the Commissioner must apply the following factors to determine the proper weight to give the opinion: (1) the length of the treatment relationship and frequency of examination; (2) the nature

18

and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner. *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996); 20 C.F.R. § 404.1527(c).

Here, Yurt's first argument concerning the opinion of Dr. Ogu is misplaced, as the February 23, 2011, document he refers to is actually signed by Ms. DeFrancesco, a counselor, *not* Dr. Ogu. (Tr. 362-64.)  Ms. DeFrancesco is considered an "other source" under the regulations. *See Furlow v. Astrue*, No. 10–554–CJP, 2011 WL 3555726, at *6 (S.D. Ill. Aug. 11, 2011); SSR 06–03p, 2006 WL 2329939, at *4.  Although opinions from "other sources" should also be evaluated using the applicable factors set forth in 20 C.F.R. § 404.1527, *see* SSR 06–03p, 2006 WL 2329939, at *4, an ALJ "need not discuss every piece of evidence in the record . . . ." *Dixon*, 270 F.3d at 1175.  Rather, an ALJ must "sufficiently articulate h[er] assessment of the evidence to assure that the ALJ considered the important evidence . . . [and to enable] us to trace the path of the ALJ's reasoning." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993).

At bottom, Yurt's argument concerning the February 23, 2011, document is a mere nitpick, as the ALJ *did* expressly consider this medical record, noting that Ms. DeFrancesco wrote that Yurt reported auditory and "a few" visual hallucinations. (Tr. 362-64.)  She further observed, however, that Ms. DeFrancesco's notes through April 2011 showed improvement and that at a July 2011 visit with Dr. Ogu, Yurt denied hearing voices and any suicidal or homicidal ideation. (Tr. 17-18.)  As a result, the ALJ's reasoning with respect to her assessment of Ms. DeFrancesco's February 23, 2011, medical record is traceable. *See Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004) (explaining that when reviewing the ALJ's decision, the court will "give

the opinion a commonsensical reading rather than nitpicking at it").

Similarly, Yurt's challenge to the consideration of Dr. Shao's records in connection with his two hospitalizations also fails to gain traction. The ALJ *did* expressly consider these records, observing that Yurt's symptoms quickly resolved upon admission. (Tr. 14, 17.) But, as the ALJ observed, these records do not offer an opinion as to Yurt's mental RFC, but simply summarize the course of inpatient treatment and discharge plan. (*See* Tr. 281-84, 301-03.) Accordingly, the ALJ met her burden of minimal articulation with respect to this evidence.[6] *See Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir.1985) ("If a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables us to trace the path of the ALJ's reasoning, the ALJ has done enough."). The Court will not accept Yurt's plea to reweigh these documents in the hope that it will come out in his favor this time. *See Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000) (explaining that the court is not allowed to substitute its judgment for the ALJ by "reweighing evidence" or "resolving conflicts in evidence").

5. <u>The RFC and Hypothetical Posed to the VE Adequately Accounted for Yurt's Moderate Deficits in Concentration, Persistence, or Pace</u>

Similar to his first argument, Yurt next contends that the ALJ failed to account in the RFC and the hypothetical for her finding at step three that he had moderate deficiencies in maintaining concentration, persistence, or pace. This argument also does not withstand scrutiny.

---

[6] In connection with this argument, Yurt criticizes the ALJ for failing to include a limitation in the RFC to restrict him from working around knives or sharps tools, baldly asserting that "if ever there was a claimant who should not work around knives and sharp tools, it is Mr. Yurt." (Pl.'s Br. 22.) But the ALJ relied upon the opinion of the state agency psychologists when assigning the RFC, and these psychologists did not assign Yurt such a limitation. Nor, for that matter, did any other doctor of record. Accordingly, this challenge to the RFC does not necessitate a reversal. *See generally Scheck v. Barnhart,* 357 F.3d 697, 702 (7th Cir. 2004) ("It is axiomatic that the claimant bears the burden of supplying adequate records and evidence to prove their claim of disability.").

At steps two and three of the sequential evaluation, the ALJ determines the severity of a claimant's mental impairment by assessing his degree of functional limitation in categories identified in the "paragraph B" and "paragraph C" criteria of the adult mental disorders listings. SSR 96-8p, 1996 WL 374184, at *4. Relevant to this appeal, the "paragraph B" criteria consist of four "broad functional areas": activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3); *see Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008).

"The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C . . . ." SSR 96-8p, 1996 WL 374184, at *4; *see Virden v. Astrue*, No. 11-0189-DRH-CJP, 2011 WL 5877233, at *9 (S.D. Ind. Nov. 4, 2011). To reiterate, the "RFC is what an individual can still do despite his or her limitations." SSR 96-8p, 1996 WL 374184, at *2; *see* 20 C.F.R. § 404.1545(a)(1). "The RFC assessment must be based on *all* of the relevant evidence in the case record." SSR 96-8p, 1996 WL 374184, at *5 (emphasis in original); *see* 20 C.F.R. § 404.1545(a)(3).

When assessing the "paragraph B" criteria at steps two and three, the ALJ concluded that Yurt had "moderate" difficulties in maintaining concentration, persistence, or pace and social functioning, but no restrictions in activities of daily living. (Tr. 14.) Then, before reaching step four, the ALJ assigned Yurt an RFC that limited him to "simple routine tasks not done around large numbers of people and with no more than brief and superficial interaction with others." (Tr. 15.)

Contrary to Yurt's assertion, the ALJ adequately accounted for his deficiencies in

21

maintaining concentration, persistence, or pace by assigning him this limitation in the RFC, which the ALJ then sufficiently incorporated into the hypothetical posed to the VE. (*See* Tr. 45.) This is because, as concluded *supra*, the RFC is amply supported by the opinion of Dr. Lovko, which the ALJ "adopted." (Tr. 19.)

As discussed earlier, after checking the box indicating that Yurt had "moderate" difficulties in maintaining concentration, persistence, or pace, Dr. Lovko wrote that Yurt still had the capacity to perform unskilled work, stating that he could "understand, remember, and carry-out unskilled tasks without special considerations in many work environments" and "attend to task for sufficient periods of time to complete tasks." (Tr. 379.) Therefore, like the consulting physician in *Johansen*, Dr. Lovko "translated [his] findings into a specific RFC assessment," 314 F.3d at 288, which the ALJ then relied upon when assigning Yurt's RFC and when posing a hypothetical to the VE at step five. In this way, the ALJ adequately accommodated Yurt's deficits in concentration, persistence, or pace, and thus Yurt's argument to the contrary is unavailing.

6. The ALJ's Failure to Expressly Consider the Evidence of Yurt's Headaches Does Not Warrant a Remand

In his final challenge to the RFC, Yurt argues that the ALJ's failure to consider the "disability implications of [his] headaches constitutes reversible error." (Pl.'s Br. 24.) In advancing this argument, Yurt points to: (1) Dr. Jan's physical examination report in May 2011 identifying "headaches" as a neurological symptom (Tr. 407), and (2) Dr. Bhat's note in July 2010, prior to his alleged onset date, that Yurt had "recurrent bifrontal pain in head represent[ing] chronic tension-type headache that have "a tendency to recur almost every day,"

for which he took Maxalt-MLT as needed. (Tr. 259-60, 267.)

Indeed, as Yurt asserts, "failure to fully consider the impact of nonsevere impairments requires reversal." *Denton v. Astrue*, 596 F.3d 419, 423 (7th Cir. 2010) (citing *Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003)); *see* SSR 96-8p, 1996 WL 374184, at *5 ("While a 'not severe' impairment standing alone may not significantly limit an individual's ability to do basic work activities, it may—when considered with limitations or restrictions due to other impairments—be critical to the outcome of a claim."). But here, there is little evidence that Yurt sought treatment for headaches, and much of the evidence he points to only refers to headaches as part of his past medical history. *See Eichstadt v. Astrue*, 534 F.3d 663, 558 (7th Cir. 2008) ("The claimant bears the burden of producing medical evidence that supports [his] claims of disability.").

In fact, Yurt never suggested on his DIB application or at the hearing that "headaches" were a factor in why he allegedly could not work full time. (*See* Tr. 33 (responding to the ALJ that his "rage" and "[in]ability to . . . be around people" were what prevented him from working full time), 143.) "[A]n ALJ is entitled to presume that a claimant represented by counsel in the administrative hearings has made [his] best case." *Sears v. Bowen*, 840 F.2d 394, 402 (7th Cir. 1988).

In short, remanding this case on the basis of Yurt's sparse evidence of headaches would "sacrifice[] on the altar of perfectionism the claims of other people stuck in the queue." *Stephens*, 766 F.2d at 288. The few tidbits of evidence that Yurt points to concerning headaches is insufficient to warrant a remand of the Commissioner's final decision. *See Fisher*, 869 F.2d at 1057); *see, e.g.*, *Prak v. Chater*, 892 F. Supp. 1081, 1087 (N.D. Ill. 1994) (explaining that a

23

"[r]emand is appropriate only if there is reason to believe a different result might ensue").

    *D. The ALJ's Step Two and Step Three Findings Are Supported by Substantial Evidence*

    In addition, Yurt argues that an aspect of the ALJ's step-two and step-three findings—that he experienced no extended decompensation episodes—is not supported by substantial evidence.   This challenge is also unconvincing.

    1. <u>Yurt's Argument Is of No Consequence to the ALJ's Step Two Finding</u>

    As to the ALJ's step two determination, it is a threshold analysis that requires the claimant to show that he has at least *one* severe impairment. *See Golembiewski*, 322 F.3d at 918 ("Having found that one or more of [the claimant's] impairments was severe, the ALJ needed to consider the aggregate effect of the entire constellation of ailments . . . ." (internal quotation marks, citation, and emphasis omitted)); *Hickman v. Apfel*, 187 F.3d 683, 688 (7th Cir. 1999) ("[I]t is quite apparent that severity is merely a threshold requirement.").  If the claimant has one or more severe impairments, the five-step analysis will continue, with the ALJ considering the combined effect of all of the claimant's impairments without regard to whether any one impairment, if considered separately, would be of sufficient severity. 20 C.F.R. § 404.1523; *see Cunningham v. Apfel*, 222 F.3d 496, 501 (8th Cir. 2000).

    Here, Yurt's challenge to the ALJ's finding that he had experienced no repeated, extended episodes of decompensation is of no moment with respect to the ALJ's step-two analysis.  This is because the ALJ indeed found at step two that Yurt's psychotic disorder was a severe impairment and thus proceeded to step three where he analyzed, in compliance with 20 C.F.R. § 404.1523, whether Yurt had "an impairment *or combination of impairments*" that meets or medically equals a listing. (*See* Tr. 11-13) (emphasis added).)  Therefore, because the ALJ

found that Yurt had at least one severe impairment at step two and properly continued the

sequential evaluation process, Yurt's step-two argument is of no consequence.

    2.    Yurt Fails to Carry His Burden of Showing That He Met or Equaled Listing 12.03

    Finally, Yurt argues that the ALJ's conclusion that he had experienced no extended

episodes of decompensation caused the ALJ to conclude in error that he did not meet or equal

Listing 12.03, the listing for psychotic disorders.  The ALJ's step-three finding, however, is

sufficiently supported.

    As background, the listings describe impairments that are considered presumptively

disabling when specific criteria are met. *See* 20 C.F.R. § 404.1525(a).  To meet or equal a listed

impairment, a claimant must satisfy all of the criteria set forth in the listing. *See Maggard v.

Apfel*, 167 F.3d 376, 380 (7th Cir. 1999).  The burden of proving that his condition meets or

equals a listed impairment rests with the claimant. *Id.*; *see also Shinaberger v. Barnhart*, No.

1:05-cv-0276-DFH-TAB, 2006 WL 3206338, at *11 (S.D. Ind. Mar. 31, 2006) ("In

demonstrating medical equivalence, the claimant has the burden of presenting 'medical findings

equal in severity to *all* the criteria for the one most similar listed impairment.'" (emphasis in

original) (quoting *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002))).

    One of the criteria for Listing 12.03 is "[r]epeated episodes of decompensation, each of

extended periods." *See* 20 C.F.R. § 404, Subpt. P, App. 1, § 12.03.

> Episodes of decompensation are exacerbations or temporary increases in
> symptoms or signs accompanied by a loss of adaptive functioning, as manifested
> by difficulties in performing activities of daily living, maintaining social
> relationships, or maintaining concentration, persistence, or pace.  Episodes of
> decompensation may be demonstrated by an exacerbation in symptoms or signs
> that would ordinarily require increased treatment or a less stressful situation (or a
> combination of the two).  Episodes of decompensation may be inferred from
> medical records showing significant alteration in medication; or documentation of

the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode.

The term repeated episodes of decompensation, each of extended duration . . . means three episodes within 1 year, or an average of once very 4 months, each lasting for at least 2 weeks.  If you have experienced more frequent episodes of shorter duration or less frequent episodes of longer duration, we must use judgment to determine if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence.

20 C.F.R. § 404, Subpt. P, App. 1, § 12.00(C).

Applying this definition with respect to Yurt, the ALJ opined:

As for episodes of decompensation, the claimant has experienced no episodes of decompensation, which have been of extended duration.  The claimant has received inpatient care on two occasions during the period, but these instances were brief.  The first instance was from December 27, 2010, to December 29, 2010, and the second occurred from January 25, 2011, to January 27, 2011.  Neither of these instances represents an extended period of decompensation; in fact, symptoms resolved quickly once admitted.  In addition, repeated episodes, as defined, have not occurred.

(Tr. 14.)  The ALJ then concluded that Yurt did not meet Listing 12.03 because he failed to satisfy the repeated episodes of decompensation requirement, as well as other criteria, for the Listing. (Tr. 15.)

But Yurt argues that by focusing on his inpatient care, the ALJ viewed the evidence of decompensation too narrowly.  Yurt instead points to the following three time periods: (1) from May 24, 2010, when his employer found him wandering the halls and he was taken to the emergency room and placed on leave, through early August 2010, when he lost his job after threatening coworkers with a knife a few days after returning to work; (2) from late December 2010 to late January 2011 when he was hospitalized twice and his medications purportedly

26

adjusted; and (3) from February 23, 2011, the date of Ms. DeFrancesco's evaluation, to March

11, 2011, when she wrote that it was a "wise decision for now" to apply for disability and after

he reportedly grabbed a coworker by the throat. (Pl.'s Br. 16.)

      Even if the first period that Yurt describes qualifies as an extended period of

decompensation since he sought care at the emergency room and was placed off work for five

weeks, the later episodes he points to were not of extended duration.  As the ALJ observed, once

Yurt was hospitalized, his symptoms quickly dissipated and on each occasion he was discharged

just two days later. (Tr. 281-90, 301-12.)  And contrary to Yurt's assertion, Dr. Shao did *not*

significantly adjust his medication during his two brief hospital stays. (Tr. 282, 302.)  Moreover,

Yurt apparently continued to work his part-time job during this period. (Tr. 11.)

      Similarly, the third period that Yurt describes does not qualify as an episode of

decompensation.  At the February 23, 2011, evaluation, Ms. DeFrancesco wrote that Yurt was

still working part time, was "not experiencing any employment related issues," and was "not

considered high risk at this time." (Tr. 363.)  Then in March, he opted to quit his job after

reportedly becoming enraged at a coworker, but Ms. DeFrancesco's notes reflected that he was

not a risk to himself or others at the time and was not having command hallucinations. (Tr. 373-

75.)  In fact, her note reflects during this period that he even watched his eight-week-old niece.

(Tr. 373.)

      Thus, on this record, Yurt has not carried his burden of showing that he experienced the

repeated episodes of decompensation, each of extended duration, that Listing 12.03 requires.

Nor, for that matter, has he shown, or even attempted to show, that he satisfied all of the *other*

criteria of Listing 12.03, a burden which is his to bear. *See Maggard*, 167 F.3d at 380.

Moreover, in reaching her decision, the ALJ relied upon the assessment of the state agency psychologists, Dr. Lovko and Dr. Larsen, who concluded that Yurt's impairments did not meet or equal a listing. (Tr. 391, 452.)  These state agency psychologists also completed Disability Determination and Transmittal forms at the initial and reconsideration levels, indicating that Yurt was not disabled. (Tr. 51, 52.)  The Seventh Circuit has articulated that "[t]hese forms conclusively establish that consideration by a physician . . . designated by the Commissioner has been given to the question of medical equivalence at the initial and reconsideration levels of administrative review." *Scheck*, 357 F.3d at 700 (internal quotation marks and citations omitted).  Consequently, "[t]he ALJ may properly rely upon the opinion of these medical experts." *Id.* (citing *Scott v. Sullivan*, 898 F.2d 519, 524 (7th Cir. 1990)); *see also* SSR 96-6p, 1996 WL 374180, at *3.

Therefore, the ALJ's step-three determination—that Yurt did not meet or equal Listing 12.03—will not be disturbed.

## V.  CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED.  The Clerk is directed to enter a judgment in favor of the Commissioner and against Yurt.

SO ORDERED.

Enter for this 8th day of July, 2013.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge